**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lawrence Ezekiel REID, Defendant–
Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Wayne Blake, Defendant–Appellant.**

**Nos. 99–50067, 99–50141.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 2000

Filed Sept. 14, 2000

Martha M. Hall, DiIorio & Hall, San Diego, California; Gerard J. Wasson, Grimes & Warwick, San Diego, California for the defendant-appellants.

Richard C. Cheng, Assistant U.S. Attorney, Appellate Section, Criminal Division, Office of the United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: PREGERSON and WARDLAW, Circuit Judges, and SHADUR,[1] District Judge.

Opinion by Judge PREGERSON; Dissent by Judge WARDLAW.

---

**1.** The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

**PREGERSON, Circuit Judge:**

Each of Lawrence Ezekial Reid and Wayne Blake ("Appellants") appeals his conviction for being an illegal alien in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). Appellants contend, inter alia, that the government's warrantless search of their apartment violated the Fourth Amendment. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## BACKGROUND

The events in this case occurred as a result of the U.S. Marshals's efforts to locate Aldrick Lloyd Edwards, an individual who was suspected of committing various narcotics and weapons violations. In September 1997, Deputy Robert Kitts learned that a close associate of Edwards, known as Mikey, resided in apartment 101 at 4424 44th Street in San Diego, California. In November of that year, Deputy Kitts went to the apartment complex to verify that Mikey lived in apartment 101. Kitts showed a photograph of Mikey to the apartment manager, who confirmed that Mikey was the person who had signed the lease. In addition to interviewing the apartment manager, Deputy Kitts and his fellow officers spoke with tenants of the apartment complex. The residents who the officers interviewed verified that Mikey resided in apartment 101 with other individuals. Deputy Kitts testified that he drove by the apartment complex "every time [he] was in the neighborhood" to ensure that Mikey had not moved. Additionally, he contacted the manager of the apartment complex on multiple occasions to verify that Mikey continued to reside there.

During his extensive and ongoing investigation of the apartment complex, Deputy Kitts observed two automobiles parked in the space assigned to apartment 101—a bronze Lexus and a bronze Acura Legend.

Deputy Kitts noted the license plate on the Lexus and learned that a woman named Sarah Buie was the registered owner.

On June 15, 1998, agents from the U.S. Marshals, the Drug Enforcement Agency ("DEA"), and the Immigration and Naturalization Service ("INS") went to apartment 101 to speak with Mikey. The officers did not have a search warrant or an arrest warrant when they went to the apartment. Deputy Kitts knocked on the front door of the apartment and a man, later identified as Junior Grant, answered. Because Deputy Kitts was aware of Mikey's appearance, he knew that Grant was not Mikey or Aldrick Edwards, the alleged fugitive who was an associate of Mikey.

After Grant opened the door, Deputy Kitts asked him if he knew who owned the Lexus that was parked in the parking space for apartment 101. Grant stated that he did not know who owned that automobile. Deputy Kitts testified that he smelled the aroma of burning marijuana at that time.[2] Shortly thereafter, Deputy Kitts displayed his law enforcement badge and identified himself as a federal agent. Grant immediately slammed and locked the door. A few seconds later, Deputy Kitts received a call over his radio informing him that another deputy marshal covering the rear exit observed a man running from the back of the apartment. The description of the man was consistent with the appearance of Junior Grant.

Deputy Kitts ran to the back of the apartment where he found another deputy detaining Grant. Grant was standing in a spread eagle position facing the sliding glass door at the rear of the apartment with another officer standing behind him. Deputy Kitts handcuffed Grant. Deputy Kitts testified that he told Grant that he was handcuffed for his safety and the safety of the officers, but that he was not under arrest. Deputy Kitts testified that there was *no* probable cause to arrest

Grant at that time. Additionally, Deputy Kitts testified that he did not hear any sounds which suggested that other individuals were inside the apartment.

The officers asked Grant for his identification, and Grant told them that it was inside the apartment. Grant told the officers that his name was "Alvin David Bryant." The officers then asked him if there was anyone else inside the apartment. Grant told them that there was not. Deputy Kitts testified that Grant then gave the officers' permission, at their request, to enter the apartment to retrieve his identification and to make sure that no one else was inside.

Grant's testimony about the events differed from the officers' testimony. Grant testified that when the officers detained him at the back of the apartment, they told him that he was going to go to prison. Grant also testified that he refused to sign a consent to search form and that he told the officers that he could not give them permission to search the apartment because it was not his residence. Grant's testimony, however, was somewhat confused.

After Grant allegedly gave the officers permission to search, the officers went inside the apartment. They observed a firearm, currency, packing boxes, clear plastic bags, and other items that they believed to be associated with marijuana trafficking. After observing these items, at approximately 9:00 a.m., Deputy Kitts left the apartment to obtain a search warrant. The other officers remained at the scene.

Deputy Kitts prepared an affidavit in support of his request for a search warrant. In that affidavit Kitts did *not* state that he and the other officers went inside the apartment to retrieve Grant's identification. Rather, the affidavit indicated that Grant "said no one else was in the residence and consented to a search for other

---

**2.** In his affidavit in support of a search warrant, however, Deputy Kitts did not indicate that he smelled marijuana when Grant opened the door. Rather, Kitts stated in his affidavit that he smelled marijuana after he and the other officers went *inside* the apartment.

persons." Agent William Mickle, who was at apartment 101 on June 15, 1998, also prepared a report. Like Deputy Kitts's affidavit, Mickle's report did not mention that the officers went inside the apartment to retrieve Grant's identification. Additionally, Mickle's report did not mention that Grant had consented to the search of apartment 101.

While the search warrant was being prepared, at approximately 10:00 a.m., Appellant Wayne Blake arrived and attempted to enter the apartment. When the officers asked him who he was, he handed Agent Mickle his wallet and refused to answer any questions. In the wallet Agent Mickle found an identification card that was purportedly issued by the police department in the U.S. Virgin Islands. Agent Mickle testified that he knew that the police in the U.S. Virgin Islands do not issue such cards and thus ascertained that the identification card was false. Subsequently, Agent Mickle arrested Blake.

About one hour later, at 11:15 a.m., Appellant Lawrence Ezekiel Reid entered the front door of the apartment and encountered the officers inside. After hearing Agent Mickle announce that he was the "police," Reid ran through the front door. Agent Mickle chased Reid and apprehended him in an area outside the apartment. As did Appellant Blake, Reid gave the officers identification purportedly issued by the police in the U.S. Virgin Islands. Agent Mickle then arrested Reid for possession of false documents.

The officers executed the search warrant at approximately 1:30 p.m. The officers found a silver Ruger GP–100 .367 magnum revolver and a silver Raven .25 semi-automatic handgun in the south bedroom of the apartment. The officers also discovered a document appearing to be a birth certificate from the U.S. Virgin Islands for Wayne Blake.

In the north bedroom, the officers located a silver Smith & Wesson .357 magnum revolver and a silver .22 caliber revolver in a dresser. The officers also found another false identification card with Reid's picture

on it in the north bedroom. Five other pictures of Reid were found in the dresser as well. Additionally, the officers found 39 boxes, nine rolls of tape, nine bags of packing material, Federal Express service bills, and Western Union money transfer receipts in the north bedroom.

The officers also found packaging and shipping materials, miscellaneous papers, an electronic scale with a 220 pound capacity, marijuana residue, and $30,000 in cash in the apartment. Based on this evidence, DEA agent Jack Kozey began an administrative forfeiture of the currency found at the residence as well as the vehicles parked in the stalls associated with apartment 101. Specifically, the DEA seized Reid's 1994 Lexus and the 1994 Acura used by Blake.

A federal grand jury in the Southern District of California returned an Indictment against Appellants on July 1, 1998, for violations of 18 U.S.C. §§ 922(g)(5) and 924(a)(2), charging Blake with being an illegal alien in possession of two firearms, and Reid with being an illegal alien in possession of one firearm. Appellants filed pretrial motions to suppress the fruits of the warrantless search of the apartment. An evidentiary hearing was held over the course of three days on August 10, 24, and 27, 1998. After the hearing, the district court took the matter under submission. On September 9, 1998, Blake filed an additional pre-trial motion to suppress the fruits of an inventory search of the 1994 Acura that was seized by Agent Kozey.

The district court denied Blake and Reid's pretrial motions. Blake and Reid were convicted as charged in the Indictment by a jury on September 24, 1998. On December 14, 1998, the district judge sentenced Blake to 33 months in custody and a 3 year term of supervised release and sentenced Reid to 21 months in custody and a 3 year term of supervised release. Blake and Reid then filed this appeal.

## DISCUSSION

Appellants contend that the government's warrantless search of apartment 101 violated the Fourth Amendment. We agree.

■■■ "A warrantless search of a house is per se unreasonable and absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment." *United States v. Shaibu,* 920 F.2d 1423, 1425 (9th Cir.1990) (internal citations omitted). Evidence that is recovered following an illegal entry into a home is inadmissible and must be suppressed. *See id.* In the present case, the district court denied Appellants' motion to suppress because it determined that Grant consented to the search and that his consent was valid. Appellants challenge this conclusion arguing that Grant did not have authority to consent and that even if he did, his consent was not voluntary. The government urges us to affirm the court's ruling that Grant's consent was valid. In the alternative, the government asserts that the warrantless search was permissible either as a protective sweep or because it was justified due to exigent circumstances.

### A. Grant's Consent Was Not Valid

■■■ The government does not contend that Grant was a resident of apartment 101 or that he had actual authority to consent to the search of that apartment. Rather, the government argues that we should affirm the district court's conclusion that Grant had "apparent authority" to consent to the search. "A determination of apparent authority presents mixed questions of fact and law and is reviewed de novo." *United States v. Fiorillo,* 186 F.3d 1136, 1144 (9th Cir.1999).

■■■ "The existence of consent to a search is not lightly to be inferred and the government always bears the burden of proof to establish the existence of effective consent." *Shaibu,* 920 F.2d at 1426 (citations omitted); *see also United States v. Welch,* 4 F.3d 761, 764 (9th Cir.1993). The existence of apparent authority entails a three-part analysis.

> First, did the searching officer believe some untrue fact that was then used to assess the consent-giver's use of and access to or control over the area searched? Second, was it under the circumstances objectively reasonable to believe that the fact was true? Finally, assuming the truth of the reasonably believed but untrue fact, would the consent-giver have had actual authority?

*Fiorillo,* 186 F.3d at 1144 (quoting *United States v. Dearing,* 9 F.3d 1428, 1429–30 (9th Cir.1993)). As the Supreme Court noted in *Illinois v. Rodriguez,* 497 U.S. 177, 188–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), even if a person invites law enforcement inside and explicitly asserts that he lives there, "the surrounding circumstances could [ ] be such that a reasonable person would doubt its truth and not act upon it without further inquiry."

The government contends that Grant had apparent authority to consent because he answered the front door and appeared to be alone in the apartment.[3] This evidence, however, is insufficient because "the mere fact of access, without more, does not indicate that the access was authorized." *Dearing,* 9 F.3d at 1430.

Moreover, the surrounding circumstances in this case were such that a reasonable person would not presume, without further inquiry, that Grant resided in apartment 101. Deputy Kitts knew that

---

3. The government failed to argue that the officers at apartment 101 believed some "untrue fact," which is a necessary element of the apparent authority doctrine. *See e.g., Fiorillo,* 186 F.3d at 1144; *United States v. Fultz,* 146 F.3d 1102, 1106 (9th Cir.1998) ("The apparent authority doctrine [ ] validates a search only where the search would be valid if the facts believed by the officer were true."); *Dearing,* 9 F.3d at 1428–29. Nonetheless, since the government argues that the search was valid under this doctrine, we assume that the government intended to argue that the untrue fact that the officers believed was that Grant resided in the apartment.

an individual named Mikey resided in the apartment and knew that Grant was not Mikey.[4] He also knew that the Lexus, which was parked in the parking space assigned to apartment 101, was registered to a woman. Also, before he identified himself as a federal agent, he asked Grant if he knew who owned the Lexus. Grant stated that he did not know who owned that automobile. This suggested that Grant did not reside there because, as Kitts testified, the Lexus was frequently parked in the parking space for apartment 101.

Additionally, Kitts testified that he drove by the apartment complex on numerous occasions and interviewed the property manager about the residents. At no time did Kitts testify that he had observed Grant in the apartment complex. Deputy Kitts also acknowledged that the property manager provided him with information about the names on the lease. He admitted that these names did not include "Junior Grant" or "Alvin David Bryant," the name that Grant gave the officers when they detained him.

In light of Deputy Kitts's knowledge about the residents of the apartment and the surrounding circumstances, it was not objectively reasonable to believe that Grant resided in the apartment simply because he opened the door and appeared to be alone. We are mindful that "mere access" to a residence, without more, is insufficient to establish apparent authority. *Dearing,* 9 F.3d at 1430. Here, other than access, the officers had no reason to believe that Grant lived in the apartment. Indeed, the officers should have asked Grant if he lived in the apartment before they entered the apartment to conduct the search. They failed to do so. Thus, the determination that Grant had authority to consent to the search simply because he answered the door to the apartment was not objectively reasonable. Accordingly, we conclude that the district court erred in

ruling that Grant had apparent authority to consent to the search.

■■■■ Furthermore, even if we were to find that Grant had apparent authority, we do not agree with the district court's determination that Grant's consent was voluntary. We will "not disturb a district court's determination that a person's consent to search was voluntary unless that determination was clearly erroneous." *Fiorillo,* 186 F.3d at 1143.

■■■■ To "establish the validity of a consent to search, the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given." *United States v. Chan–Jimenez,* 125 F.3d 1324, 1327 (9th Cir.1997). "Judicial concern [for] the sanctity of the home is so elevated that free and voluntary consent cannot be found by a showing of mere acquiescence to a claim of lawful authority." *Shaibu,* 920 F.2d at 1426; *see also United States v. Spires,* 3 F.3d 1234, 1237 (9th Cir.1993). Rather, the government "must show that there was no duress or coercion, express or implied" and that the consent was "unequivocal and specific" and "freely and intelligently given." *Shaibu,* 920 F.2d at 1426.

■■■■ Whether consent was voluntarily given " 'is to be determined from the totality of all the circumstances.' " *Id.* (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). We consider the following factors to assess whether the consent was voluntary: (1) whether the person was in custody; (2) whether the officers had their guns drawn; (3) whether a *Miranda* warning had been given; (4) whether the person was told that he had the right not to consent; and (5) whether the person was told that a search warrant could be obtained. *See United States v. Torres–Sanchez,* 83 F.3d 1123, 1129–30 (9th Cir.1996). Although no one factor is determinative in

---

4. Deputy Kitts testified that he had a photograph of the fugitive that he was looking for, Aldrick Edwards, and that he had a photograph of the individual known as Mikey. Kitts admitted on the stand that he was very familiar with these photographs.

the equation, *see United States v. Castillo,* 866 F.2d 1071, 1082 (9th Cir.1988), "many of this court's decisions upholding consent as voluntary are supported by at least several of the factors," *Chan–Jimenez,* 125 F.3d at 1327 n. 3.

In this case, the relevant considerations overwhelmingly favor the finding that Grant did not voluntarily consent to a search of the apartment. Although the government argues that Grant was not under arrest, the record shows that the officers ordered Grant up against the sliding glass door, placed him in a spread eagle position, frisked him, and then handcuffed him. Grant testified that the officers told him that he was "going to prison." Additionally, all of the officers were armed; and the record suggests that at least one officer had his gun drawn. Moreover, the officers neither read Grant his *Miranda* rights nor informed him that he had the right not to consent to the search.

Under the totality of the circumstances we conclude that the government did not sustain its burden of proving that the consent was voluntarily given. Consequently, the district court's determination that Grant voluntarily consented was clearly erroneous.

B.  The Warrantless Search Was neither a Protective Sweep nor Justified by Exigent Circumstances

■ In attempting to salvage the unconstitutional search of apartment 101, the government argues that the warrantless search of apartment 101 was valid as a protective sweep[5] and that it was justified by exigent circumstances.

In *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) the Supreme Court defined "protective sweep" as "a quick and limited search of premises,

incident to an arrest and conducted to protect the safety of police officers or others." 494 U.S. at 327, 110 S.Ct. 1093. The Court further explained that:

> as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 334, 110 S.Ct. 1093 (emphasis added); *see also United States v. Noushfar,* 78 F.3d 1442, 1448 (9th Cir.1996) (quoting *Buie* and noting that "[a] protective sweep may last 'no longer than it takes to complete the arrest and depart the premises' "). In the present case, Deputy Kitts testified that when the officers detained Grant in the back of the apartment, Grant was *not* under arrest. Additionally, the government did not point to any facts that demonstrated that a reasonably prudent officer would have believed that the apartment "harbor[ed] an individual posing a danger to those on the arrest scene." *See Buie,* 494 U.S. at 334, 110 S.Ct. 1093. Therefore, the officers were not entitled to conduct a protective sweep under *Buie.*

■ Moreover, it is clear that no exigent circumstances existed to justify the officers' warrantless entry and search of apartment 101. "Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search [ ] until a warrant could be obtained." *United*

---

5.  We note that in making this argument, the government seeks to have it both ways. The government argues that Grant had apparent authority to consent to the search because he was alone. The government then argues that the search was valid as a protective sweep because it was necessary to make sure no one else was in the apartment. Additionally, the government argues that Grant's consent was voluntary, in part, because he was not under arrest, and then cites cases that permit a protective sweep incident to arrest.

States v. Gooch, 6 F.3d 673, 679 (9th Cir. 1993) (citation omitted) see also United States v. Delgadillo–Velasquez, 856 F.2d 1292, 1298 (9th Cir.1988). Mere speculation is not sufficient to show exigent circumstances. See United States v. Tarazon, 989 F.2d 1045, 1049 (9th Cir.1993). Rather, "[t]he government bears the burden of showing the existence of exigent circumstances by particularized evidence." Id. This is a heavy burden and can be satisfied "only by demonstrating specific and articulable facts to justify the finding of exigent circumstances." LaLonde v. County of Riverside, 204 F.3d 947, 954 (9th Cir.2000) (internal quotation marks omitted). Furthermore, "the presence of exigent circumstances necessarily implies that there is insufficient time to obtain a warrant; therefore, the government must show that a warrant could not have been obtained in time." Tarazon, 989 F.2d at 1049.

The government argues that the warrantless search was justified because it was possible that other individuals were inside the apartment. The only "specific and articulable facts" that the government cites to justify this conclusion are: (1) Deputy Kitts smelled the aroma of burning marijuana coming from the apartment[6]; and (2) the Lexus was parked in the parking space for apartment 101.

The smell of burning marijuana cannot satisfy the heavy burden that the government must overcome because one person can smoke marijuana alone. Similarly, the fact that the Lexus was parked in the parking space for apartment 101, standing alone, is insufficient to establish exigent circumstances. Other than the two facts offered by the government, there was no evidence that other persons were inside

the apartment. Deputy Kitts testified that he did not hear anything that indicated that another person was inside the apartment. And when Grant was detained at the back of the apartment he told the officers that there was no one else inside. Moreover, the officers did not have any information that Grant or anyone possibly inside the apartment was violent. The officers did not see any guns and Grant cooperated with the officers when he was detained outside.

Finally, the government did not explain why the officers could not have simply staked out the apartment while waiting for a warrant. In fact, the evidence established that Deputy Kitts obtained a warrant early that afternoon.

Accordingly, we conclude that the warrantless entry and search of apartment 101 was not a protective sweep and was not justified by exigent circumstances.

## CONCLUSION

The government's warrantless search of apartment 101 violated the Fourth Amendment and any evidence resulting from that search is inadmissible.[7] See Shaibu, 920 F.2d at 1425. Appellants Blake and Reid's convictions are therefore REVERSED and REMANDED for further proceedings consistent with this opinion.

WARDLAW, Circuit Judge, dissenting.

Although I generally agree with the majority's statement of the law, I disagree with its application of the law to the facts at hand. Because the district court correctly ruled that the consent to search apartment 101 was valid, I would affirm the convictions. Therefore, I respectfully dissent.[1]

---

**6.** As noted supra in footnote 2, Deputy Kitts's affidavit in support of a search warrant indicated that he smelled the marijuana after he and the other officers went inside the apartment. Deputy Kitts's affidavit did not mention that he smelled burning marijuana when Grant opened the front door.

**7.** Because we conclude that the warrantless search of the apartment violated the Fourth

Amendment we need not reach the other issues raised by Appellants in their briefs on appeal.

**1.** Because the protective sweep was a search supported by a valid consent, I need not reach the issues whether the search was also supportable by exigent circumstances or as a protective sweep incident to an arrest.

## I.

At approximately seven or eight o'clock in the morning on June 15, 1998, Deputy United States Marshal Kitts knocked on the door of apartment 101 at 4424 44th Street in San Diego. Kitts had been informed that the men living at the apartment were "black males with accents consistent with Jamaican nationals." Therefore, when a black man, later identified as Junior Grant, opened the door, Kitts spoke with him specifically "to ascertain his accent." Kitts concluded that "[h]is voice depicted a Jamaican accent or an accent consistent with Jamaican males." At the same time, through the open door, Kitts noted the scent of burning marijuana.[2]

When Kitts identified himself as a law enforcement officer, Grant slammed the door shut and locked it. One of Kitts's partners at the scene shortly thereafter saw Grant running out the back of the apartment, and he stopped Grant, without the use of force.[3] Prompted by this officer's call over the radio, Kitts ran to the back of the building, where he found that Grant had abandoned his flight and was standing with his hands on the back door. Kitts's partner, who was in plain clothes,[4] had his gun drawn.

Kitts acted to defuse the situation. He "informed . . . Grant immediately . . . that [the agents] were there just to speak to him, but [Kitts] was going to cuff [Grant] for [Kitts's] safety, and that he wasn't under arrest at that point." Kitts handcuffed Grant and "inquired of him whether there was anyone else in the house." Grant answered that there was not. When Kitts asked Grant for identification, Grant indicated that it was in the apartment. After again asking Grant whether anyone else was in the apartment, Kitts then asked permission to enter the house to get the identification.[5] Grant consented to the entry. Then, as the officers and Grant entered the apartment, Kitts asked for permission for the officers to "look[ ] around the apartment just to make sure there were no other persons there for officer safety." Again, Grant consented. During this consensual protective sweep, evidence was found in plain view that provided support for a search warrant and, eventually, led to the convictions.

## II.

A person has authority to consent if he or she shares "mutual use of the property [and] joint access or control for most purposes." *United States v. Dearing*, 9 F.3d 1428, 1429 (9th Cir.1993). When actual authority is absent, we will uphold a consensual search under the doctrine of apparent authority if "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 111

---

**2.** Although the majority refers to the absence of such a fact from the search warrant affidavit, *see* Maj. Op. at 1023 n. 2, 1027 n. 5, this discrepancy was squarely raised before the district court, which found as a fact that Kitts did smell the burning marijuana. *See* Memorandum Decision and Order, filed September 16, 1998, by the District Court ("Memorandum") at 2. The district court's resolution of this issue—which at bottom was a credibility determination—is not clearly erroneous. *See United States v. Cervantes*, 219 F.3d 882, 891 (9th Cir.2000) ("We review a district court's credibility determination for clear error.").

**3.** It may be that this officer stated to Grant that he was going to prison. *See* Maj. Op. at 1023, 1027. Grant's testimony was extremely

confused, and it is not clear whether he attributes this "prison" comment to Kitts or to Kitts's partner. To the extent that he alleges Kitts to have made the statement, Grant's allegation was discredited by the district court, which expressly found Kitts's testimony more credible than that of Grant to the extent that they conflicted. *See* Memorandum at 16. (Kitts's testimony, needless to say, did not indicate that he said such a thing.)

**4.** The record does not make clear whether Kitts himself was in uniform.

**5.** It is not clear whether Kitts's partner still had his weapon in hand at the time of this request for consent.

L.Ed.2d 148 (1990) (internal quotation marks omitted) (omission in original). Here, Deputy Kitts's conclusions about Grant's authority were reasonable in light of the facts known to him.

Grant answered the door early in the morning, a time when someone who answers an apartment door is likely to be a resident or a person otherwise closely associated with the property. Grant, who answered the door, had an accent corresponding to the accent that, the officers knew, the occupants of the apartment possessed. The presence of burning marijuana suggests that Grant was no stranger to the apartment: either he was comfortable enough in the apartment to smoke marijuana, or others in the apartment were familiar enough with his presence that they would do so. Grant stated that he was alone in the house, which is suggestive of authority over the place. He answered the door without knowing who would be on the other side. Finally, he did not carry his identification on his person but instead left it around the house, suggesting that he was comfortable there, not a casual visitor or a business visitor but someone with substantial connections to the place.[6]

Although the evidence does not point all in one direction on the question of apparent authority,[7] the officers' conclusions were not unreasonable. No more is required.

### III.

In assessing whether Grant's consent was voluntary, the district court must consider "the full richness of [the] encounter," *United States v. Morning*, 64 F.3d 531, 533 (9th Cir.1995), and "the totality of all the circumstances," *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), while being guided by the factors (noted by the majority) that we

have discussed in various cases. We review the district court's determination of voluntariness for clear error. *See United States v. Welch*, 4 F.3d 761, 763 (9th Cir. 1993).

In the case before us, the district court considered the circumstances, noted that they point in both directions, and made careful findings of fact. Judge Enright reasoned, "Certainly, there are facts showing the agents employed a level of force to the encounter: within minutes of the time Grant gave his consent, he had been held at gunpoint, handcuffed, and frisked. The agent did not tell Grant that he had a right to refuse." Noting its finding that Grant had been legally stopped and that "even a person under arrest can voluntarily consent to a search," *see United States v. Tolias*, 548 F.2d 277, 278 (9th Cir.1977), however, the district court stated that "despite the show of authority, Kitts diffused the situation by specifically informing Grant that he was not under arrest and that he used the handcuffs for safety reasons." The district court noted that when Grant originally answered the front door, in like vein, Kitts had indicated that he "only wanted to talk to" him. The court observed that "Grant was on familiar territory, and was not transported to a distant or isolated location."

As the district court found, the facts point both ways. The handcuffs and guns were threatening; but the officers acted to dispel any coercion Grant may have felt. Kitts's partner, and perhaps Kitts himself, were in plain clothes. Although Grant apparently had no experience with law enforcement in the past, he was in a familiar place during this encounter. Nothing in the record suggests that the agents attempted to procure Grant's consent by stating that they could obtain a warrant

---

6. The majority is, of course, correct that "the mere fact of access, without more, does not indicate that the access was authorized." Maj. Op. at 1025 (quoting *Dearing*, 9 F.3d at 1430). But, as noted above, far more than "mere access" was apparent from the facts available to the officers at the time.

7. One contrary piece of evidence, as noted by the majority, is that Grant disclaimed knowledge of one of the two cars known to be associated with the apartment.

regardless of consent. Moreover, the request for permission to retrieve the identification was legitimate, as was the further request for permission to conduct a quick search for safety's sake. These requests are far less threatening than a request to search every nook and cranny for inculpatory evidence.

Judge Enright considered the relevant factors, recognized the arguments on both sides, and made the delicate contextual analysis of voluntariness. I cannot say that I am "left with the definite and firm conviction that a mistake has been committed," *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir.1998) (en banc), necessary for overturning this finding of fact.

## IV.

None of the appellants' other arguments for the reversal of their convictions are persuasive, and I, therefore, would affirm the convictions. I would order further submissions from the parties to determine whether appellant Reid's challenge to his sentence is moot.[8]

---

8. At oral argument, Reid's counsel stated that Reid had been released from custody and either had been or soon would be deported. The parties have not confirmed for us that this deportation has occurred. Moreover, it is unclear from the record whether the terms of Reid's sentence provide that deportation would terminate the supervised release to which he was sentenced. Because the appeal from the sentence is moot if the sentence has been completed, I would order the parties to brief these issues. *Compare United States v.*

*Palomba*, 182 F.3d 1121, 1123 (9th Cir.1999) (holding appeal from sentence moot where the sentence had been completed), *with United States v. Valdez–Gonzalez*, 957 F.2d 643, 646–47 (9th Cir.1992) (holding appeal from sentence not moot even though aliens sentenced to supervised release had been deported and were not required to report to their probation officers, because "should [they] be rearrested in the United States, their supervised release time would be converted to incarceration time").