**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

OMAR ARREGUIN,
*Defendant-Appellant*.

No. 12-50484

D.C. No.
5:08-cr-00161-VAP-1

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Submitted July 23, 2013[*]

Filed November 22, 2013

Before: Alfred T. Goodwin, Dorothy W. Nelson,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Goodwin

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Criminal Law

The panel reversed the district court's denial of a motion to suppress the fruits of a home search, and remanded with instructions, in a case in which the government had the burden of establishing that a houseguest had apparent authority to consent to searches of specific areas where DEA agents found the challenged evidence.

The panel held that the agents knew far too little to hold an objectively reasonable belief that the houseguest could consent to a search of the master bedroom and bathroom or of the area beyond a door inside the master bedroom.

The panel held that the government's "protective sweep" fallback argument is waived and that the "plain view" doctrine does not apply.

The panel instructed the district court to enter an order granting the defendant's motion to suppress a shoe box, a white substance, a Gucci bag, and cash, and to consider whether the defendant's inculpatory statements, five packages of methamphetamine, and any other evidence found after the unconstitutional searches should be suppressed as fruits of the poisonous tree.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Nicholas F. Reyes, Fresno, California, for Defendant-Appellant.

Daniel Ackerman, Assistant United States Attorney, Antoine F. Raphael, Assistant United States Attorney, Chief, Riverside Branch Office, André Birotte, Jr., United States Attorney, for Plaintiff-Appellee.

**OPINION**

GOODWIN, Circuit Judge:

After the district court denied Omar Arreguin's motion to suppress the fruits of a home search, he entered a conditional guilty plea to charges under 21 U.S.C. § 841, and reserved his right to appeal the district court's ruling. We heard his appeal and affirmed in part, reversed in part, and remanded for further proceedings. *United States v. Arreguin*, 453 F. App'x 678 (9th Cir. 2011). On remand, the district court once again denied the suppression motion, and Arreguin again appeals. We reverse, remand, and instruct the district court to grant the motion.

## I. BACKGROUND

### A. DEA AGENTS CONDUCT A "KNOCK AND TALK" INVESTIGATION

On August 16, 2008, nine law enforcement officers, including DEA Agents John Rubio and Paul McQuay,

conducted a "knock and talk" investigation[1] at a Riverside, California home (the "Residence"). Present inside the home were its three primary residents, Arreguin, his wife Maria Ledesma-Olivares, and their baby. One houseguest, Elias Valencia, Jr., was also on the premises.

## B. THE RESIDENCE

### 1. Floor plan of the Residence

The Residence's front porch and entry door are located approximately 20–25 feet from the nearest sidewalk. Just behind the front door is a foyer that extends seven or eight feet into the Residence. Just beyond the foyer there are a living room and a family room. Beyond the foyer and further into the Residence is a master bedroom.

Inside the master bedroom, there are two additional doors. Passing through the first of the doors leads, unremarkably, into the attached master bathroom. But passing through the second door leads, somewhat surprisingly, into the Residence's garage.

### 2. Agents' knowledge of the Residence's floor plan

Nothing in the record suggests that the DEA Agents had any preexisting knowledge of the Residence's somewhat unique floor plan when they began their "knock and talk"

---

[1] In a "knock and talk" investigation, police officers "approach the front door of" a residence, knock on the door, and seek "to speak to an occupant for the purpose of gathering evidence." *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1423 (2013) (Alito, J., dissenting); *Kentucky v. King*, 536 U.S. ___, 131 S. Ct. 1849, 1862 (2011).

investigation. To the contrary, the record reveals that the Agents did not know much at all about the premises.

In his initial live testimony, for example, Rubio stated that he and his fellow Agents did not even "know exactly who resided" at the Residence, and that they planned to find out during the course of the "knock and talk." He later acknowledged once again that when he approached the house, he did not know who was inside. Although the Residence was searched by *local* law enforcement "several months prior," neither Rubio nor McQuay made any mention of the DEA's involvement in that prior search. For his part, McQuay affirmatively acknowledged that he did not participate in the prior search.

## C. ENCOUNTER AND OBSERVATIONS AT THE RESIDENCE'S FRONT DOOR

At approximately 11:00 a.m. on August 16, 2008, Agents Rubio, McQuay, Chad Corbin, and two other officers approached the Residence from the street. Rubio was one of the first two or three agents to approach the front porch area, alongside Group Supervisor Daniel Neill. After Rubio knocked on the entry door between three and seven times, a sleepy-looking Valencia opened the door, and the two began talking.

With the door open, both Rubio and McQuay (who was standing six feet behind Rubio) could see into and slightly beyond the entry area. From his vantage point on the porch, Rubio was able to see Ledesma-Olivares standing just beyond the foyer, holding an infant, and he was able to see Arreguin standing several feet inside the Residence, holding a shoe box. McQuay also noticed Arreguin and the shoe box, and he

then observed Arreguin disappearing and reappearing from view "about four times" behind Valencia. Eventually, Arreguin briefly disappeared from McQuay's field of vision while moving to McQuay's right; when Arreguin reappeared, McQuay realized that he was no longer holding the shoebox.

Meanwhile, Rubio had a brief conversation with Valencia, while Ledesma-Olivares and Arreguin looked on. Rubio explained that "we're here from the DEA" and "we know this house. There was drug-related activity before. We would like to come in and look around. Can we come in[?]"[2] Valencia said yes and stepped back towards the rear of the foyer. Neither Arreguin nor Ledesma-Olivares voiced any objections.

---

[2] The district court relied on Rubio's initial written declaration to find that when he "sought consent from Valencia to search the residence, he specifically sought consent to search for 'narcotics and narcotics related evidence.'" Based on the record before us, we have "a definite and firm conviction that a mistake has been committed" and we conclude that the district court's reliance on the declaration was clearly erroneous. *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 693 (9th Cir. 2010).

Rubio's declaration indicated that he "asked Valencia for consent for our team to enter the Residence and search it for narcotics and narcotics related evidence." But Rubio backpedaled away from his declaration in open court. In particular, while under cross-examination, Rubio clearly testified that he used the words we quoted above at the door to the Residence. No mention was made of "narcotics and narcotics related evidence," despite counsel offering Rubio an opportunity to further clarify the words he used.

It is elementary that "confrontation m[ay] cause a witness to recant his accusatory statement," and we conclude that is what happened here. *United States v. Huber*, 772 F.2d 585, 589 (9th Cir. 1985). It is therefore troubling that the district court would rely on Rubio's declaration when his live testimony contradicted the declaration's contents.

### D. AGENTS PROCEED INSIDE THE RESIDENCE

Very quickly thereafter, the Agents made entry into the Residence. At that time, Rubio observed Arreguin walking swiftly toward the master bedroom of the Residence, down a hallway, and out of sight. McQuay and Corbin followed Arreguin, stopped at the hallway, and called for him to return to the main entrance area. Within 30 seconds, he did so, and the Agents followed him back to the foyer.

### E. MCQUAY ENTERS THE MASTER BEDROOM AND ATTACHED MASTER BATHROOM

At that point, Rubio and Arreguin began talking in a family room, while McQuay and Corbin headed further into the Residence, ostensibly performing a "cursory safety sweep."

McQuay and Corbin moved past Valencia through the entry area of the home and proceeded to their right, because that was where McQuay had last seen Arreguin moving with the box. Within a matter of 30 seconds, McQuay proceeded further into the Residence, turned left, and found himself in the master bedroom area. The door to the attached master bathroom was open, and McQuay was able to observe the cabinet underneath the bathroom sink. He saw a blue shoebox in the cabinet, with its cover removed, and noticed a white powdery substance inside the box. The box and the white substance were seized.

### F. MCQUAY ENTERS THE GARAGE

After finding the shoebox, McQuay entered the garage through the second door in the master suite. Inside the

garage, McQuay observed a parked Toyota Corolla and approached the window. From that vantage point, McQuay explained, he could see multiple bundles of cash in a Gucci bag. The bag and the cash were seized, and Agents subsequently discovered that the cash amounted to $176,990.

## G. RUBIO DETERMINES THAT ARREGUIN IS A PRIMARY RESIDENT

As McQuay proceeded through the master bedroom and garage, Rubio started to speak with Arreguin in Spanish inside the Residence's family room. Arreguin informed Rubio that he and his wife and infant lived at the Residence, and that Ledesma-Olivares was an illegal alien in the United States. But a minute into this conversation, McQuay interrupted Rubio and told him that the shoebox, the Gucci bag, and the cash had been found.

Rubio and the other Agents switched gears.

## H. ARREGUIN SIGNS CONSENT FORM AND REVEALS HIDDEN METHAMPHETAMINE

Soon, Agents isolated Arreguin in a rear bedroom and informed him that it would be beneficial to him if he cooperated with them. Rubio also informed Arreguin that he "would not refer [Ledesma-Olivares's] case to Immigration" if Arreguin cooperated. When Agents presented a written consent-to-search form, Arreguin signed it and led them to the garage, where he opened a secret compartment inside the Corolla and revealed five individual duct-tape-wrapped bricks of suspected methamphetamine. The methamphetamine packages were seized.

## I.  RUBIO DETERMINES THAT VALENCIA IS A MERE GUEST

After he had finished his conversation with Arreguin, Rubio interviewed Valencia again in the Residence's kitchen area, approximately five minutes after his first conversation with Valencia in the entry area.  Valencia presented identification from Atlanta, Georgia, and Rubio then learned that Valencia was a mere guest at the Residence.

## II.  PROCEDURAL HISTORY

After Arreguin was indicted under 21 U.S.C. § 841, he moved to suppress the shoebox, the white substance, the Gucci bag, and the cash, claiming the Agents lacked consent for their warrantless search of the Residence.  After the district court heard and denied the motion, Arreguin entered a conditional guilty plea and appealed.

We affirmed in part, reversed in part, and remanded, noting that: (1) the government had to show Valencia's consent to the Agents' searches, through the actual or apparent authority doctrines; and (2) in the "apparent authority" context, the government had "the burden of establishing that Valencia had apparent authority to consent to the specific areas" where the Agents found the challenged evidence. *Arreguin*, 453 F. App'x at 681 (citing *United States v. Dearing*, 9 F.3d 1428, 1430 (9th Cir. 1993);[3] *United States v. Davis*, 332 F.3d 1163, 1170 (9th Cir. 2003); *United*

---

[3] *Dearing* was overruled on other grounds in *United States v. Kim*, 105 F.3d 1579 (9th Cir. 1997).

*States v. Fultz*, 146 F.3d 1102, 1106 (9th Cir. 1998); *United States v. Welch*, 4 F.3d 761, 765 (9th Cir. 1993)[4]).

On remand, Arreguin renewed his suppression motion. The district court received additional documentary evidence, heard additional testimony, and once again denied the motion. Arreguin timely appeals.

### III. DISCUSSION

#### A. LEGAL STANDARDS

##### 1. Standards of Review

We review the district court's denial of a motion to suppress *de novo*. *United States v. Diaz*, 491 F.3d 1074, 1077 (9th Cir. 2007). We review the district court's factual findings underlying the denial for clear error, and where, as here, testimony is taken, the district court's credibility determinations are given "special deference." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008). The issue of whether a person has actual or apparent authority to consent to a search is a mixed question of law and fact reviewed *de novo*. *United States v. Kim*, 105 F.3d 1579, 1581–82 (9th Cir. 1997).

##### 2. Fourth Amendment Standard

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

---

[4] *Welch* was overruled on other grounds in *United States v. Kim*, 105 F.3d 1579 (9th Cir. 1997).

be violated." U.S. CONST. amend. IV. Therefore, it is "a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)) (internal quotation marks omitted). "Evidence recovered following an illegal entry of the home is inadmissible and must be suppressed." *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990).

### 3. Consent Doctrines

Although "consent is a recognized exception to the Fourth Amendment's protection," *United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012), the government has the burden of establishing the effectiveness of a third party's consent to a search of a defendant's property. *Welch*, 4 F.3d at 764. "The existence of consent to a search is not lightly to be inferred. . . ." *United States v. Reid*, 226 F.3d 1020, 1025 (9th Cir. 2000).

The government may meet its burden to show consent by demonstrating that: (1) a third party had "shared use and joint access to or control over a searched area"; or (2) "the owner of the property to be searched has expressly authorized a third party to give consent to the search." *Welch*, 4 F.3d at 764. Or, if the government cannot present proof of a party's

"actual authority,"**[5]** the government "may establish consent by means of the 'apparent authority doctrine.'" *Id.*

### 4.  Apparent Authority Doctrine

"Under the apparent authority doctrine, a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent." *Id.***[6]** "Apparent authority is measured by an objective standard of reasonableness, and requires an examination of the actual consent as well as the surrounding circumstances." *United States v. Ruiz*, 428 F.3d 877, 881 (9th Cir. 2005). Thus, in assessing whether an officer's belief was objectively reasonable, the court considers "the facts available to the officer *at the moment*." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (emphasis added).

As we previously explained, the government "has the burden of establishing" apparent authority "to consent to

---

**[5]** During Arreguin's first appeal, the government never "argued . . . that Valencia possessed actual or any express authority to consent to a search." *Arreguin*, 453 F. App'x at 680. And the government's current answering brief also omits an actual-authority argument. The issue is waived. *See McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009); *Munoz v. Imperial Cnty.*, 667 F.2d 811, 817 (9th Cir. 1982).

**[6]** *Dearing* approached the apparent-authority doctrine by employing a three-part test. 9 F.3d at 1429–30; *see also United States v. Tosti*, No. 12-10067, — F.3d —, 2013 WL 5433756, *6 (9th Cir. Oct. 1, 2013); *United States v. Ruiz*, 428 F.3d 877, 880–81 (9th Cir. 2005). But *Dearing*'s three-part test was merely a restatement of the rules in *Welch* and *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). *See Dearing*, 9 F.3d at 1429–30. In this case, using *Welch*'s simpler formulation of the apparent-authority doctrine clarifies our analysis.

[each] specific area[] searched, not just authority to consent to a generalized search of [a] residence." *Arreguin*, 453 F. App'x at 681; *see Dearing*, 9 F.3d at 1430; *Davis*, 332 F.3d at 1170 (third party sharing apartment with defendant did not have actual or apparent authority to consent to search of defendant's belongings, located inside apartment); *Fultz*, 146 F.3d at 1106 (homeowner did not have apparent authority to consent to search of appellant's boxes, located inside home); *Welch*, 4 F.3d at 765 (third party who consented to search of car did not have apparent authority to consent to search of purse, located in trunk of car).

In addition, the Supreme Court teaches that a mere invitation to enter a particular premises is not itself adequate for apparent-authority purposes. "Even when the invitation [to search] is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without *further inquiry*." *Rodriguez*, 497 U.S. at 188 (emphasis added). Similarly, Ninth Circuit law provides that the "mere fact of" a third party's access to an area, "without more, does not indicate that the access was authorized" and that the third party had authority to consent to a search of the area. *Reid*, 226 F.3d at 1025.

## B.  APPLICATION

When the Agents obtained Valencia's consent to "look around" the Residence, they knew virtually nothing about: (1) him; (2) the various separate rooms and areas inside the Residence; or (3) the nature and extent of Valencia's connection to those separate areas. And the Agents did not ask Valencia any additional questions at that time. Instead, Agents McQuay and Corbin quickly rushed past him and

started "rummaging around [the Arreguins'] home," inspecting various rooms, and satisfying "the curiosity police always have about what they might find." *United States v. Lemus*, 596 F.3d 512, 513 (9th Cir. 2010) (Kozinski, C.J., dissenting from denial of rehearing en banc).

The "police are not allowed to proceed on the theory that ignorance is bliss." *Dearing*, 9 F.3d at 1430 (internal quotation marks omitted). And the Agents were proceeding in a state of near-ignorance when they searched both the master suite and the area behind the second door in the master suite. They knew far too little to hold an objectively reasonable belief that Valencia could consent to a search of those areas.[7]

    **1.  It was not objectively reasonable for the Agents to conclude that Valencia had authority to consent to a search of the master bedroom and bathroom.**

At "the moment" when McQuay first entered the master suite, *Rodriguez*, 497 U.S. at 188, he knew that:

- Valencia had access to the Residence and was present near the foyer area;

- Arreguin, Ledesma-Olivares, and their infant had access to the Residence and were initially present near the foyer area;

- Valencia had answered the door at 11:00 a.m.;

---

[7] We need not—and do not—decide whether the Agents could have reasonably believed Valencia had authority to consent to their initial entry into the Residence.

- Valencia had a sleepy appearance;

- Arreguin had possessed a shoebox;

- Arreguin had placed the shoebox in some other portion of the Residence, to the right of the foyer;

- Neither Arreguin nor Ledesma-Olivares had objected to Valencia's consent to the Agents' entry;

- Arreguin had moved rapidly away from the foyer towards the master bedroom;

- McQuay and Agent Corbin had followed in Arreguin's direction, stopped at the hallway, called for him to return to the main entrance area, and followed him back; and

- The master bathroom was adjacent to the master bedroom.

Valencia's answering of the Residence door is not, in and of itself, adequate to justify a reasonable belief that he had authority to consent to a search of the master suite. *See Dearing*, 9 F.3d at 1429 (third party has authority to consent if he has "mutual use of the property [and] joint access or control for most purposes"); *Watts v. Cnty. of Sacramento*, 256 F.3d 886, 890 (9th Cir. 2001) (in § 1983 suit alleging Fourth Amendment violations, the "mere fact that [plaintiff] answered the door of [a] home in his boxer shorts did not establish a reasonable belief that he lived there").

The fact of Valencia's presence inside the Residence at 11 a.m. is similarly unhelpful to the government. It is "hardly

unusual to have" three or four "visitors at one's home," or guests who might visit "late at night" and then perhaps spend a late morning sleeping in one's home. *United States v. Rios*, 449 F.3d 1009, 1015 (9th Cir. 2006). Individual schedules for working, visiting friends, receiving guests, and sleeping vary tremendously.

Valencia's apparently sleepy appearance also fails to support a reasonable belief that he had authority to consent to a search of the master suite. A sleepy demeanor might potentially suggest some tenuous connection with *a* bedroom area, but not necessarily with the particular bedroom area that McQuay searched.

The government points to Arreguin and Ledesma-Olivares's presence and failure to object when Valencia consented to the Agents' entry as additional factors supporting his apparent authority. However, at the moment Valencia gave his consent, the Agents still did not know anything about him or the other two adults near the foyer, including which, if any of the them, lived in the Residence. "[W]ithout further inquiry," *Rodriguez*, 497 U.S. at 189, Valencia and Ledesma-Olivares's silence was insufficient for the Agents to reasonably believe Valencia had authority to consent to a search of the master bedroom.[8]

The remaining pieces of information known to the Agents, although very limited, do not further suggest that Valencia had "mutual use of the" master bedroom area or

---

[8] The government's reliance on *Georgia v. Randolph*, 547 U.S. 103 (2006), is unavailing. *Randolph* did not consider these circumstances, where the officers simply do not know which of the individuals present in a residence is a primary resident.

"joint access or control for most purposes." *Dearing*, 9 F.3d at 1429. Arreguin's decision to place his personal property in another portion of the Residence is, if anything, consistent with *his* occupancy of that portion of the premises. Arreguin's sudden departure from the foyer into the master suite is more consistent with *his* occupancy of that area. And Arreguin's reluctant re-emergence from the master suite, which occurred only upon the Agents' verbal directions and under their watchful eyes, also points to *his* occupancy of the area. But none of these events speaks to the level of *Valencia*'s control over the master suite.

With this very limited set of facts available, "a reasonable person would not presume, without further inquiry, that" Valencia had joint use, access, or control over the master bedroom and master bathroom area. *Reid*, 226 F.3d at 1025. The failure to inquire properly weighs against the government, not Arreguin, because the police are simply "not allowed to proceed on the theory that ignorance is bliss." *Dearing*, 9 F.3d at 1430 (internal quotation marks omitted).[9]

---

[9] We distinguish this case from *United States v. Enslin*, 327 F.3d 788 (9th Cir. 2003). In *Enslin*, the officers "knew that John and Shannon Palacios resided at [a] house," came to the door of the house, and encountered Shannon Palacios, who identified herself to the officers and "gave them unlimited permission to search." 327 F.3d at 791 n.3, 794. The court concluded that under those circumstances, Palacios had apparent authority to consent to a search of the back bedroom of the house. *Id.* at 794.

At the time of the Agents' entry, by contrast, they did not know the legal occupants of the Residence; they did not ask for or receive identifying information from Valencia; they did not ask for or receive information about Valencia's control or authority over the Residence; and they did not specifically obtain permission from Valencia to search the entire premises. In brief, the situation confronting the Agents here is a far

**2. It was not objectively reasonable for the Agents to conclude that Valencia had authority to consent to a search of the area beyond the door inside the master bedroom.**

After viewing Arreguin's shoebox and its contents, McQuay went "through the [second] door in the master bedroom" and found himself in the garage area. At the time he went through the second door, McQuay knew that:

- Valencia had access to the Residence and was present near the foyer area;

- Arreguin, Ledesma-Olivares, and their infant had access to the Residence and were initially present near the foyer area;

- Valencia had answered the door at 11:00 a.m.;

- Valencia had a sleepy appearance;

- Arreguin had possessed a shoebox;

- Arreguin had placed the shoebox in some other portion of the Residence, to the right of the foyer;

- Neither Arreguin nor Ledesma-Olivares objected to Valencia's consent to the Agents' entry;

- Arreguin had moved rapidly away from the foyer towards the master bedroom;

---

cry from the situation in *Enslin*, where numerous indicia of authority supported the officers' acceptance of consent to search.

- McQuay and Agent Corbin had followed in Arreguin's direction, stopped at the hallway, called for him to return to the main entrance area, and followed him back;

- The master bathroom was adjacent to the master bedroom; and

- Arreguin's shoebox was located inside the master bathroom.

The occupants' mere presence at the front of the Residence would not, by itself, support a conclusion that they had specific access to or control over the area behind the second door. Arreguin's movements toward the master suite would suggest, if anything, that he, not Valencia, had access to or control over that area.

And, by the time McQuay went through the second door, he had found Arreguin's shoebox in the master bathroom. Finding Arreguin's shoebox is a limited point of knowledge, but it even more closely ties *Arreguin*, not Valencia, with the area, and points to Arreguin's access and control in that portion of the Residence.

Faced with this information, a "reasonable person would not presume, without further inquiry, that" Valencia had any access, control, or authority over additional areas adjacent to the master suite. *Reid*, 226 F.3d at 1025. From McQuay's perspective, the door could have led to a second master bathroom; the door could have led to an adjacent nursery area for the infant in the home; the door could have led to a standard closet; the door could have led to a walk-in closet; the door could have led to some other private portion of the

Residence; or the door could have led to a common area (as, in fact, it did). But the limited information available to McQuay at the time he went through that door did not tie Valencia to the area adjacent to the door.

## C. FALLBACK ARGUMENTS

With the "apparent authority" issue resolved, we turn to the government's fallback arguments.

### 1. The government's "protective sweep" fallback argument is waived.

The government now attempts to fall back on the "protective sweep" doctrine. But the record is clear that the government never raised a "protective sweep" claim during the initial district court proceedings, nor in its brief on the first appeal. *See Arreguin*, 453 F. App'x at 681 (protective sweep "discussed at oral argument" only); *Trigueros v. Adams*, 658 F.3d 983, 988 (9th Cir. 2009) (generally, "arguments not raised before the district court are waived"); *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009) (issue raised "[a]t oral argument" but not "raised clearly and distinctly in the opening brief" was waived). The argument is therefore doomed by the rule of *Munoz v. Imperial County*, 667 F.2d 811 (9th Cir. 1982), under which "[w]e need not and do not consider a new contention that could have been but was not raised on the prior appeal." 667 F.2d at 817.

### 2. The "plain view" doctrine does not apply.

The government seeks to cleanse its warrantless search by citing the "plain view" doctrine. But the "plain view" doctrine does not apply unless the initial entry is lawful,

either pursuant to a warrant or under a recognized exception to the warrant requirement. *United States v. Hotal*, 143 F.3d 1223, 1228 (9th Cir. 1998). Here, the government has no warrant, the government cannot rely on a consent exception due to Valencia's lack of apparent authority, and the government has waived the "protective sweep" exception. With nothing left to support the "initial entry" into each of the challenged areas, the plain view doctrine fails. *Id.*

## IV. CONCLUSION

We reverse, remand, and instruct the district court to enter an order granting Arreguin's motion to suppress the shoe box, the white substance, the Gucci bag, and the cash. Upon remand, the district court shall also consider whether Arreguin's inculpatory statements, the five packages of methamphetamine, and any other evidence found after the unconstitutional searches should be suppressed as "fruits of the poisonous tree." *See United States v. Redlightning*, 624 F.3d 1090, 1102 (9th Cir. 2010) ("[E]vidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was purged of the primary taint.") (internal quotation marks omitted).

**REVERSED and REMANDED with instructions.**