**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA
          *Plaintiff-Appellee,*

          v.

JUAN HERNAN LEMUS,
          *Defendant-Appellant.*

No. 08-50403

D.C. No.
3:07-cr-03238-
VQH-1

OPINION

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Submitted June 1, 2009*
Las Vegas, Nevada

Filed September 22, 2009

Before: Ronald M. Gould, Johnnie B. Rawlinson and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

---

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

**COUNSEL**

Kyle W. Hoffman, Assistant United States Attorney; Karen P. Hewitt, United States Attorney; and Bruce R. Castetter, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Jeremy D. Warren, San Diego, California, for the defendant-appellant.

---

**OPINION**

BYBEE, Circuit Judge:

Juan Hernan Lemus appeals the district court's denial of his motion to suppress incriminating evidence discovered during a warrantless search of his apartment following his arrest. Even assuming that there were no articulable facts which would warrant a reasonably prudent police officer to believe that Lemus's apartment harbored an individual posing a danger to those on the arrest scene, we nevertheless affirm the district court's denial of the suppression motion. Because the area in which the police officers discovered the incriminating evidence "immediately adjoin[ed] the place of arrest," the officers were justified in conducting a search of that area without either probable cause or reasonable suspicion, *Maryland v. Buie*, 494 U.S. 325, 334 (1990), and anything in plain view that they discovered in the course of that search could be seized without violating the Fourth Amendment, *Horton v. California*, 496 U.S. 128, 136-37 (1990).

I

When Detective Longoria clocked in to the office at six o'clock to report for his morning briefing, Sergeant Gerardo was waiting for him. The Sergeant informed him that the DA

had issued a warrant for the arrest of Juan Hernan Lemus, of Calexico. Detective Longoria had dealt with Lemus before. A year or so back he had been to Lemus's place for a probation search, and found drugs. But Detective Longoria knew Lemus wasn't just into drugs. He recalled that Lemus had been a member of a group busted for a drive-by shooting. And he remembered that some of Lemus's cousins had been arrested for violent crimes.

Detective Longoria checked the database. Lemus's arrest warrant was in there. It looked like Lemus was still living at the same place, an apartment out on Sixth Street. If he remembered right, it was part of a small complex with a house and two other apartments. Some of Lemus's family members lived there too.

He and Detective Diaz drove out to Sixth Street. They parked in front of Lemus's residence, and started watching for Lemus. An hour later, he appeared, walking out of his apartment and over to his mother's house. Shortly after, he left his mother's house and walked back to his apartment, carrying a beige envelope. Nothing looked out of place. Lemus was just heading back toward his apartment. But Detective Longoria thought he'd better call in some more units. Lemus might be dangerous if cornered.

The detectives drove up to the side of Lemus's apartment and pulled up next to a fence surrounding the property. Detective Longoria jumped out and started calling to Lemus. Lemus saw them and asked what was going on. The detectives responded that Lemus had an outstanding arrest warrant and that they were going to take him into custody.

No response. Lemus slowly backed away, toward the sliding glass door on the side of his apartment.

Sergeant Gerardo and Officer Orozco arrived for backup. They tried to explain the situation to Lemus from across the

fence. But he continued to retreat towards his apartment. He opened the sliding glass door.

The officers continued to tell Lemus to come out, but Lemus instead started to walk into the apartment. The officers were there in an instant, taking hold of Lemus and handcuffing him before he could fully enter the doorway and retreat into his living room.

Detective Longoria thought he'd better check to make sure no one was hiding out in the apartment. He sent Gerardo and Orozco in. They scanned the living room, and didn't see anyone. Just a couch and a TV. Checked the bedroom and bathroom too. Negative. Lemus was alone.

Diaz, in the living room, got Detective Longoria's attention. Wasn't there something sticking out from the couch? Detective Longoria thought it looked like the butt of a weapon. Since Lemus was a felon, having a gun would be a crime. Detective Longoria lifted the couch cushion to make sure, and confirmed that it was a semi-automatic handgun. It was later determined to be a Sturm and Ruger, 9 millimeter.

Detective Longoria let the cushion fall. He thought he should get a search warrant before touching the gun—he didn't want to lose the chance to seize it. He left the officers at the scene to keep things secure, and headed back to the station.

The warrant was issued, and the Ruger was seized. After agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives discovered that the weapon was manufactured in Arizona and had been moved in interstate commerce, a grand jury returned a one-count indictment charging Lemus with being a felon knowingly in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). In district court, Lemus moved to suppress the pistol, claiming that it was obtained unlawfully because it was discovered dur-

ing a warrantless search. When the district court denied the motion, Lemus entered a conditional guilty plea preserving his right to appeal the district court's denial of his suppression motion. *See* FED. R. CRIM. P. 11(a)(2). This appeal followed.

II

We review de novo the district court's determination of Lemus's motion to suppress, and may affirm the district court's denial of the motion "on any basis supported in the record," *United States v. Lopez*, 482 F.3d 1067, 1071 (9th Cir. 2007) (quoting *United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005)) (quotation marks omitted), "even if the district court did not consider the issue." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 (9th Cir. 2007). In undertaking this review, we must accept the district court's factual findings unless they are clearly in error. *United States v. Orman*, 486 F.3d 1170, 1173 (9th Cir. 2007).

A

**[1]** The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. Because "[i]t is axiomatic that 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,' " *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)), "a 'basic principle of Fourth Amendment law' [is] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 749 (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). *See also Katz v. United States*, 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (footnote omitted)).

Nevertheless, because "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests,' " *United States v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)), the Supreme Court has identified exceptions to the warrant requirement for searches conducted immediately following a home arrest. The Court has recognized that "unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' " *Buie*, 494 U.S. at 333. This disadvantage creates concern that the suspect may gain access to hidden weapons. *See generally Chimel v. California*, 395 U.S. 752, 768 (1969). It also creates concern that others associated with the suspect might ambush the officers, and "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Buie*, 494 U.S. at 333. Thus, the Court has held that "the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and while making, the arrest." *Id.* at 334.

**[2]** In *Chimel*, the Court authorized a narrow search of the arrestee's "person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him." 395 U.S. at 768. Such a search, justified by the State's interests in the safety of the arresting officer and in preserving evidence, is strictly limited to the area "within [the arrestee's] immediate control"—"the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Id.* at 763. *See also Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983); *Terry v. Ohio*, 392 U.S. 1, 27-28 (1968).

**[3]** Later, in *Buie*, the Court refined its analysis in *Chimel*. It noted the "interest of the [arresting] officers in taking steps

to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack" and described two types of searches that might immediately follow an arrest and for which a warrant was not required. 494 U.S. at 333-34. First, the officers' interest in their own safety justifies a search "incident to the arrest . . . as a precautionary matter and without probable cause or reasonable suspicion, . . . [of] closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. Second, the officers can perform a further protective sweep beyond immediately adjoining areas when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." *Id.* This "protective sweep" is not a license to search every nook and cranny of a house, but is subject to two significant limitations: it "extend[s] only to a cursory inspection of those spaces where a person may be found" and lasts "no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

B

In this case, we need not decide whether Detective Longoria or the other investigating officers had "articulable facts which . . . would warrant [the officers] in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene" that would justify a protective sweep. *Buie*, 494 U.S. at 334.[1] Because the record clearly

---

[1]We also need not decide whether Detective Longoria's search of the living room is authorized as a search of the area "within [Lemus's] immediate control." *See United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir. 1996) (citing *Chimel*, 395 U.S. at 763). The testimony presented during the suppression hearing did not conclusively establish the positioning of the couch (and the weapon within the couch) in relation to Lemus at the time of the arrest, and the parties have not argued that the search was permissible under *Chimel*.

demonstrates that Lemus was arrested in an area "immediately adjoining" the living room, a limited search of that room was proper without either reasonable suspicion or probable cause as a protective search incident to the arrest. *See id.*

**[4]** According to *Buie*, a "protective search 'incident to the arrest' "**²** to protect the arresting officers from the danger of a surprise attack can be completed without reasonable suspicion or probable cause if two conditions are present. First, the area searched must "immediately adjoin[ ]" the area of arrest. *Id.* Second, the area searched must be one "from which an attack could be immediately launched," and thus in any event

---

**²**Although other courts have labeled this type of search a "protective sweep," *see, e.g.*, *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005) ("In *Buie* the Supreme Court established a two-prong test for determining whether a protective sweep incident to an arrest was constitutionally permissible."); *United States v. Ford*, 56 F.3d 265, 269 (D.C. Cir. 1995) ("The Court [in *Buie*] identified two situations in which protective sweeps are justified, and two types of protective sweeps."), it is clear from the Court's description in *Buie* that this search is distinct from that normally classified as a protective sweep. In its conclusion, the Court stated that "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest *when the searching officer possesses a reasonable belief* based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 337 (emphasis added). Because the Court had already made clear that a search of adjoining areas did not require reasonable suspicion, *see id.* at 334, it would thus be contradictory to classify a search of such areas as a "protective sweep." *See also Buie*, 494 U.S. at 342 n.6 (Brennan, J., dissenting) ("The Court's decision also to expand the 'search incident to arrest' exception previously recognized in *Chimel v. California*, allowing police officers . . . to look into 'closets and other spaces . . .,' is equally disquieting" (internal citations omitted)). Accordingly, we refer to the search of immediately adjoining areas, as did *Buie*, as a "protective search incident to arrest" to distinguish it from the broader "protective sweep" also authorized by *Buie*. Because we have not been entirely clear on this distinction in the past, *see, e.g.*, *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir. 2000), we do not consider the government to have forfeited the argument that the search was justified as a protective search incident to arrest merely by arguing that the search was a valid "protective sweep" under *Buie*.

must be capable of concealing at least one person. *Id.* Both of these conditions are satisfied here.

**[5]** Although the exact location of Lemus's arrest was disputed in the district court, the district court found that he was apprehended shortly after he had "stepped into the apartment breaking the threshold of the sliding glass door." This finding was not clearly in error. Even taking Lemus's account of the events as authoritative, it is clear that at most Lemus was only partially outside the living room when he was arrested. The living room thus "immediately adjoined" the area where Lemus was arrested. *Cf. Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 628 (7th Cir. 2008) (holding that it was not a constitutional violation, under *Buie*, for a police officer to enter the plaintiff's house after the plaintiff's arrest in the attached garage); *United States v. Charles*, 469 F.3d 402, 405-06 (5th Cir. 2006) (holding that *Buie* permitted a search of an open storage unit when the suspect was arrested immediately outside); *United States v. Thomas*, 429 F.3d 282, 288, 290-91 (D.C. Cir. 2005) (holding that *Buie* permitted the search of a bedroom fifteen feet down a hallway in which the suspect was arrested); *In re Sealed Case*, 153 F.3d 759, 763, 770 (D.C. Cir. 1998) (holding that *Buie* permitted a search of a small bedroom a few feet down the hallway from the bedroom in which the suspect was arrested); *United States v. Lauter*, 57 F.3d 212, 216-17 (2d Cir. 1995) (holding that, under *Buie*, the second room in a two-room apartment immediately adjoined the first room in which the suspect was arrested).

**[6]** Lemus's living room not only immediately adjoined the area of arrest, but was a place from which an attack could be immediately launched. The district court found that Lemus had opened the sliding glass door, which created additional hazards for the officers. We have recognized that "[a] bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another." *United States v. Hoyos*, 892 F.2d 1387, 1397 (9th Cir. 1989),

*overruled on other grounds by United States v. Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001) (en banc). When Lemus opened the door, he not only gave himself access to the living room but exposed the officers to anyone lying in wait inside. The room was obviously large enough to hide one or more attackers. Although, as Lemus points out, the police officers could have left the premises immediately after the arrest, this fact does not make the search of the living room any less necessary—there was no guarantee that a potential attacker would not ambush the officers after they had turned their backs to the door.

**[7]** Because the living room immediately adjoined the place of arrest and was large enough to contain an attacker, we need not reach the second prong of *Buie* and decide whether the search of the living room was justified as a "protective sweep." The officers were permitted to search the room "as a precautionary matter" without either reasonable suspicion or probable cause to believe that an attacker lay in ambush. *Buie*, 494 U.S. at 334.

## C

**[8]** Because the police officers were lawfully permitted by *Buie* to enter the "immediately adjoining" living room to search for potential assailants, they could also seize the firearm under the "plain view" doctrine if (1) the weapon was in "plain view" and (2) "its incriminating character [was] immediately apparent." *Horton*, 496 U.S. at 136-37 (quotation marks omitted); *see also United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir. 2005) ("To fall within the plain view exception, two requirements must be met: the officers must be lawfully searching the area where the evidence is found and the incriminatory nature of the evidence must be immediately apparent." (quotation marks omitted)).

**[9]** Detective Longoria's un-rebutted testimony established that the weapon was in plain view. The testimony made clear

that Detective Diaz noticed something sticking out from under a couch cushion, and when Detective Longoria raised the cushion, he saw clearly that it was the butt of a pistol.

**[10]** Detective Longoria's prior experience with Lemus made the incriminating nature of the evidence immediately apparent, because the detective had "probable cause to believe that [the pistol was] associated with criminal activity." *Stafford*, 416 F.3d at 1076 (quoting *Horton*, 496 U.S. at 131). Detective Longoria was one of the police officers who was present during the prior probationary search of Lemus's apartment, and knew that Lemus had been convicted of a felony. Because it is illegal for a felon to possess a firearm, *see* 18 U.S.C. § 922(g)(1), Detective Longoria had probable cause to believe that the pistol was illegal.

**[11]** Detective Longoria's decision to lift the couch cushion to confirm his belief did not render the search unconstitutional. Once the detective realized that the weapon was illegal, he was justified in lifting the couch cushion to confirm his beliefs. *See Arizona v. Hicks*, 480 U.S. 321, 326 (1987) ("It would be absurd to say that an object could lawfully be seized and taken from the premises, but could not be moved for closer examination.").[3]

### III

Because the warrantless search of Lemus's living room was justified as a protective search incident to arrest, no Fourth Amendment violation occurred when police officers discovered the semi-automatic pistol. Accordingly, we affirm the district court's denial of the motion to suppress.

AFFIRMED.

---

[3]In fact, the police officers were even more careful than necessary. Although they were justified in seizing the weapon when they first entered Lemus's apartment, they proceeded to obtain a search warrant before removing the pistol from the premises.