**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

v.

JUAN HERMAN LEMUS,
       *Defendant-Appellant.*

No. 08-50403

D.C. No.
3:07-cr-03238-
VQH-1
Southern District of
California,
San Diego

ORDER

Filed February 18, 2010

Before: Ronald M. Gould, Johnnie B. Rawlinson and
Jay S. Bybee, Circuit Judges.

Order;
Dissent by Chief Judge Kozinski

---

## ORDER

A judge of this court *sua sponte* called for this case to be reheard en banc. A vote was taken, and a majority of the active judges of the court did not vote for a rehearing en banc. Fed. R. App. P. 35(f). The call for this case to be reheard en banc is DENIED.

---

Chief Judge KOZINSKI, with whom Judge PAEZ joins, dissenting from the denial of rehearing en banc:

This is an extraordinary case: Our court approves, without blinking, a police sweep of a person's home without a war-

rant, without probable cause, without reasonable suspicion and without exigency—in other words, with nothing at all to support the entry except the curiosity police always have about what they might find if they go rummaging around a suspect's home. Once inside, the police managed to turn up a gun "in plain view"—stuck between two cushions of the living room couch—and we reward them by upholding the search.

Did I mention that this was an entry into somebody's home, the place where the protections of the Fourth Amendment are supposedly at their zenith? The place where the "government bears a heavy burden of demonstrating that exceptional circumstances justif[y] departure from the warrant requirement." *United States* v. *Licata*, 761 F.2d 537, 543 (9th Cir. 1985). The place where warrantless searches are deemed "presumptively unreasonable." *Payton* v. *New York*, 445 U.S. 573, 586 (1980).

Government encroachment into the home, which I lamented three years ago in *United States* v. *Black*, 482 F.3d 1044, 1045-46 (9th Cir. 2007) (Kozinski, J., dissenting from the denial of rehearing en banc), has continued, abetted by the creative collaborators of the courts. This is another example: The panel goes to considerable lengths to approve a fishing expedition by four police officers *inside* Lemus's home after he was arrested just *outside* it. The opinion misapplies Supreme Court precedent, conflicts with our own case law and is contrary to the great weight of authority in the other circuits. It is also the only case I know of, in any jurisdiction covered by the Fourth Amendment, where invasion of the home has been approved based on no showing whatsoever. Nada. Gar nichts. Rien du tout. Bupkes.

Whatever may have been left of the Fourth Amendment after *Black* is now gone. The evisceration of this crucial constitutional protector of the sanctity and privacy of what Amer-

icans consider their castles is pretty much complete. Welcome to the fish bowl.

**1.** The panel approves the entry of a team of police into Lemus's home by relying on *Maryland* v. *Buie*, 494 U.S. 325 (1990), but *Buie* is nowhere on point. *Buie* was a case where the police were already legitimately inside the home when they arrested the suspect. *Id.* at 328. The question was whether they could look in the area immediately adjoining the arrest where someone who could ambush them might be hiding. *Id.* at 328, 330, 333. The Court recognized that police inside an arrestee's home are peculiarly vulnerable because they are on the suspect's turf—a place where someone dangerous might be hiding. *Id.* at 333-36. The risk is present in every case because a suspect's home is inherently dangerous for police who must enter to make an arrest. *Id.* But *Buie* says nothing at all about police who conduct an arrest *outside* of the home. It does not authorize police to *enter* a home for the very purpose of conducting a search. That is the situation we have here.

Lemus was in his side yard when Detectives Longoria and Diaz called out that they were there to arrest him. Two patrol officers arrived at the scene just as Lemus started to back slowly towards his living room door. After he opened it, "[t]he officers were there in an instant, taking hold of Lemus and handcuffing him before he could fully enter the doorway and retreat into his living room." *United States* v. *Lemus*, 582 F.3d 958, 960 (9th Cir. 2009). Note: They grabbed him and had him handcuffed "before he could fully enter the doorway" and before he could "retreat into his living room." Instead of walking away with the handcuffed Lemus in tow, the officers entered the apartment and had a good look around. "Checked the bedroom and bathroom too." *Id.* The detectives then went into the living room, where Longoria found a gun. *Id.* at 960-61.

The panel says the police could enter the home—with no suspicion whatsoever—because Lemus's living room "imme-

diately adjoined" the place surrounding the arrest, *Lemus*, 582 F.3d at 964, but *Buie* only authorizes a suspicionless search when the police make an "in-home arrest" (and then only for a small area near the arrest, not a grand tour of the entire apartment). 494 U.S. at 333-36. Here there was no in-home arrest. How do we know this? Because the opinion says so: After making the arrest, Longoria "sent" the patrol officers "in" to Lemus's apartment. *Lemus*, 582 F.3d at 960. Officers who are already inside an apartment don't need to be sent in.

The entire justification *Buie* gives for a warrantless search is that officers must be able to protect themselves when they perform an "in-home arrest." *Buie*, 494 U.S. at 333-34 & n.1 When an arrest doesn't take the police into a suspect's home, they aren't forced into the "confined setting of unknown configuration" that *Buie* worries about. *Id.* at 333. They're outside, just the same as in an "on-the-street or roadside investigatory encounter." *Id.* Yet "[e]ven in high crime areas, where the possibility that any given individual is armed is significant," the Court still requires "reasonable, individualized suspicion" before police can perform a search. *Id.* at 334 n.2.

The panel's fig leaf for this clearly illegal search is that "at most Lemus was only partially outside" of his living room door when the officers seized him. *Lemus*, 582 F.3d at 963. So what? Under *Buie*, Lemus's location at the time of arrest is irrelevant; it's the location of the police that matters. *Buie* authorizes a search incident to an in-home arrest because being inside a suspect's home "puts *the officer* at the disadvantage of being on his adversary's 'turf,' " 494 U.S. at 333 (emphasis added), where *the officer* has more to fear than in an "on-the-street-encounter[ ]." *Id.* at 334 n.2. If the police surround a suspect's home, guns drawn, and order him out—and he complies—may the police go rummaging through his home without suspicion because the suspect was arrested when he was inside? Surely not.

Whatever portion of Lemus's body may have gotten into his living room, the officers seized and handcuffed him with-

out themselves entering. *Lemus*, 582 F.3d at 960. Here is how Longoria testified about the arrest:

> Q: Okay. Now when you arrested Mr. Lemus, he was standing in front of the sliding glass door?
>
> A: No, he had—he had stepped back into the sliding glass door. *He had just broken the threshold pretty much.*
>
> Q: So he wasn't in the apartment, he was just inside the door?
>
> A: No, he was inside the apartment. He had stepped back into the apartment *breaking the threshold* into the apartment, and that is where we immediately grabbed up [sic] him before he could make it into one of the rooms there.

(emphasis added). [ER 42] Note the emphasis on "breaking the threshold;" this was a well-coached witness. But what his testimony makes clear is that the officers were not *required* to go inside Lemus's home to arrest him; they *chose* to go inside, unnecessarily exposing themselves to the very danger the Supreme Court sought to ameliorate in *Buie*. The district court's findings and Longoria's affidavit confirm this. [ER 10-11, 14, 60]

Warrantless searches have "always been considered to be a strictly limited right . . . grow[ing] out of the inherent necessities of [certain] situation[s]." *Chimel* v. *California*, 395 U.S. 752, 759 (1969) (internal quotation marks omitted). The "scope" of a warrantless search "must therefore be strictly defined in terms of the justifying 'exigent circumstances.' " *Coolidge* v. *New Hampshire*, 403 U.S. 443, 478 (1971). The *Buie* exception is particularly toxic to Fourth Amendment values because it permits a search with zero individualized suspicion—with nothing at all but the presumption that the

home is a dangerous place for the police. This is a fair presumption if the police are already inside the home and exposed to danger. But to use the exception as a wedge for entering the home turns *Buie* inside out.

**2.** We've dealt with an arrest made just outside the home before. In *United States* v. *Paopao*, 469 F.3d 760 (9th Cir. 2006), we upheld a search of an apartment after officers arrested a man in the hallway right outside, but *only* because the officers had "a reasonable suspicion of danger." *Id.* at 766 (citing *Buie*, 494 U.S. at 335-36). The opinion nowhere cites *Paopao*. It's not because the panel wasn't aware of the case—both parties cited it in their briefs.

The panel quotes instead from an older case, *United States* v. *Hoyos*: "A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another." 892 F.2d 1387, 1397 (9th Cir. 1989), *overruled on other grounds by United States* v. *Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001) (en banc). Yet *Hoyos* required the arresting officers to articulate reasonable suspicion that they might be shot from inside the apartment. *Id.* at 1397-98. The panel here allows a search without *any* suspicion. Merging *Hoyos* and *Buie*, as the panel does, allows police to search an arrestee's home without suspicion, so long as the arrest is within a rifle shot of the home.

No other circuit allows entry into the home on less than reasonable suspicion. *E.g.*, *United States* v. *Lawlor*, 406 F.3d 37, 39, 41 (1st Cir. 2005) (entry through an open door to search the home after an "arrest that occurs just outside the home" requires reasonable suspicion); *United States* v. *Cavely*, 318 F.3d 987, 994-96 (10th Cir. 2003) (arrest "just outside of the back door"); *United States* v. *Colbert*, 76 F.3d 773, 776-77 (6th Cir. 1996) ("just outside a home"); *United States* v. *Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995) ("just outside the open door"); *United States* v. *Oguns*, 921 F.2d

442, 445-47 (2d Cir. 1990) ("just outside of [defendant's] apartment").

The panel cites not one case that stands for the contrary proposition. Its cases from the Second, Seventh and D.C. Circuits all involved arrests inside, not outside, the home. *Peals* v. *Terre Haute Police Dep't*, 535 F.3d 621, 624-25, 628 (7th Cir. 2008) (arrest occurred inside defendant's garage); *United States* v. *Thomas*, 429 F.3d 282, 287-88 (D.C. Cir. 2005) (inside apartment); *In re Sealed Case 96-3167*, 153 F.3d 759, 762-63, 770 (D.C. Cir. 1998) (inside bedroom); *United States* v. *Lauter*, 57 F.3d 212, 213, 216-17 (2d Cir. 1995) (inside apartment). The Fifth Circuit case it cites, *United States* v. *Charles*, 469 F.3d 402, 405-06 (5th Cir. 2006), involved a storage unit, not a home.

**3.** How has it come to this? There's a simple answer: Plain view is killing the Fourth Amendment. Because our plain-view case law is so favorable to the police, they have a strong incentive to maneuver into a position where they can find things in plain view, or close enough to lie about it.

This is a case in point. While the officers were finishing their room-to-room sweep of Lemus's apartment, apparently finding no one and nothing suspicious, the detectives entered as well. Yet *Buie* permits only a sweep for people who might be dangerous. Once the officers found no one in the living room, what authorized entry by the detectives? There was absolutely no reason for the detectives to enter except to try to find contraband in "plain view." So, the detectives went in and, while there, Diaz thought he saw "something sticking out from the couch" that "looked like the butt of a weapon." *Lemus*, 582 F.3d at 960. Longoria then lifted the couch cushion "to make sure" and found a gun. *Id.* at 961. Under what theory of "plain view" may police lift cushions off a couch to make sure something is contraband? Why weren't the officers required to get a warrant—if they could—based on what they saw, before rummaging through the couch?

If the officers and detectives had truly feared for their safety, they would certainly have moved away from Lemus's apartment once they took him into custody. Instead, they did the very thing that *Buie* says puts a police officer in danger: They went inside a suspect's home. They didn't just peek either, which might be consistent with a claim that they were checking to make sure they could retreat unmolested. The officers swept *every* room; Longoria and Diaz hung out in the living room long enough to study Lemus's couch and dig through its cushions. The officers clearly took advantage of Lemus's arrest to conduct a leisurely search of his home looking for contraband. The story that the officers went inside to protect their safety is so transparently contrived that my colleagues can't even tell it with a straight face. *Id.* at 960-61.

These officers were never at risk from anyone within the apartment, and they knew it. Longoria and Diaz had been to Lemus's apartment before and knew he lived alone. There wasn't any evidence Lemus had an accomplice in the crime the police thought he had committed. Before arresting him, Longoria and Diaz watched his apartment for over an hour, beginning in the early morning, but they saw no one go in or out until Lemus emerged and walked over to his mother's house. And when they finally saw Lemus walking back to his apartment—the time when the detectives sprung into action— he was alone.

The part of the story where Lemus was arrested with one foot inside the door was never mentioned by the detectives until the suppression hearing. It was not in the probable cause statement supporting the warrant application (which was obtained after the officers had already gone digging through the couch cushions) or in the two-and-a-half-page narrative report Longoria prepared about the arrest. [ER 30, 42-43] It was a detail conveniently—but not very convincingly—added when they realized the search was no good and thought this (irrelevant) fact might redeem it.

Plain view encourages the police to find every possible loophole to get themselves into a place where they can take a good look around, discover some evidence and then get a warrant to seize what they already know is there. This tiresome two-step is the new dropsy evidence. As often as not, the chance of hitting the plain-view jackpot is what drives the police into a man's house, his doctor's office or his ISP. Carefully drawn limitations in a warrant and narrow justifications for exceptions to the warrant requirement are becoming afterthoughts. "Police officer safety," the narrow justification in *Buie*, had nothing to do with this search. Gathering evidence did. We should not abet such skirting of the Fourth Amendment by the police; it only encourages them to do worse.